[Opinion delivered March 10, 1886.]

|    |      |
|----|------|
| 20 | 547  |
| 30 | 482  |
| 30 | 650  |

[No. 2016.]

## RUSS CHUMLEY v. THE STATE.

1. PRACTICE — ARSON — EVIDENCE.— The primary rule of evidence which requires that the proof shall correspond with the allegations of the indictment, and be confined to the point in issue, excludes all proof of collateral facts or those which are incapable of affording any reasonable presumption or inference as to the principal fact or matter in issue. Under this rule it was error to permit the State, over objection, to prove that, prior to the commission of the arson for which he was on trial, the defendant was charged with the commission of another and distinct offense, and was a fugitive from justice.

2. SAME.— It was error to permit the State's witness D. to testify, over objection, to what he told one A. about certain clothing found in his house, inasmuch as the defendant was not present when D. made the statement to A.; and it was error to permit A. to testify to what D. told him on that occasion, as this testimony was purely hearsay.

3. SAME.— The trial court, over objection, permitted the State to introduce in evidence against the defendant certain *ex parte* affidavits of the prosecuting witness charging the defendant and his co-defendants with the commission of the arson on trial. *Held*, error, because the evidence was *res inter alios acta*, and inadmissible.

4. SAME.— It being in proof that, in an effort to arrest one L. as an accomplice in the offense, the said L. shot the officer, and was then fired upon and killed by the officer, the State, over objection, was permitted to introduce in evidence the torn and bloody warrant which the officer, when shot by L., was attempting to execute upon L. *Held*, error; because this evidence tended in no degree to establish the guilt of the defendant, and was calculated only to influence and prejudice the jury against the defendant as a confederate of L. in the shooting of the officer.

APPEAL from the District Court of Milam. Tried below before the Hon. W. E. Collard.

The indictment in this case charged the appellant, J. W. Pickett and Jesse Kaiser, jointly, with the offense of wilfully burning the store-house of J. M. Eplin & Co., in Milam county, Texas, on the 10th day of March, 1885. The appellant, being alone upon trial,

was convicted, and his punishment was assessed at a term of five years in the penitentiary.

J. M. Eplin was the first witness for the State. He testified that he was the senior member of the firm of J. M. Eplin & Co., which firm had been doing a mercantile business in the town of Yarrelton, Milam county, Texas, a little more than a year. The firm's store-house in Yarrelton was burned between midnight and daybreak on Sunday, the 5th of April, 1885. Witness lived in a house situated about two hundred yards distant from the store. Witness was asleep at the time the fire was discovered, but was awakened by his wife. Witness dressed at once and went to his burning store, arriving at about the same moment that Doctor Elzey, S. J. Stapleton and Battenfield arrived. The flames were then bursting through the roof and the walls of the building, but the structure had not yet fallen. The store door was open and disclosed a place on the side of the building where a large hole had been made in the wall by boring a large number of holes with an augur and removing some of the plank. The house was consumed. The ground was examined on Monday morning after a light rain had fallen. Several augers and a brace and bit were found near the place where the holes were bored, and near where the safe had stood. Mr. Stapleton identified the tools as his. The store-house belonged to J. M. Eplin & Co., and, when burned, contained a general stock of merchandise.

Since the fire the witness had seen several of the articles which the firm had in stock in the house on the night that it was burned. In July, 1885, after the burning of the store-house, the witness, in company with John Anderson, deputy sheriff of Milam county, went to the house of Harmon Dansby in Bell county, with search warrants to search Dansby's house. The search was made, and a vest was found hanging in a shed room of Dansby's house, which vest the witness identified as belonging to the stock of merchandise in the store-house at the time of the fire. That vest was claimed by a man named Wells. Witness also found a pocket-knife in the possession of Dansby's little son, which he identified as one of the stock of pocket-knives in the store on the night of the fire. During the same July, and after the defendant's arrest, the witness and Anderson went to Bosque county, and witness sued out a search warrant for the search of Willis Parker's house, for the defendant's property. Parker pointed out the baggage which the defendant brought to his house from his own (defendant's) house after his arrest. Two pairs of saddle-pockets were found among the articles of the defendant's baggage pointed out by Parker. Those saddle-

pockets the witness identified as belonging to the stock of saddle-pockets in the store on the night of the fire. Witness had previously furnished Anderson with the cost mark of saddle-pockets. Those marks, as made by the witness himself, were found on the inside of the flaps of each pair of saddle-pockets. Witness kept two different patterns of saddle-pockets in stock, and the two pair pointed out by Parker as belonging to defendant corresponded with the two different patterns. The marks used by J. M. Eplin & Co. were different from any marks given by any other business house that the witness ever heard of, and were invented to serve as a private cost and sale mark. One pair of the saddle-pockets were marked "XXX," which meant that they cost $2, and they were marked in figures to sell for $3. The other pair was marked "X—XX," meaning that they cost $3, and they were marked in figures to sell for $4.

In one pair of the saddle-pockets the witness found a pair of pants and a vest, which he identified as belonging to the stock of merchandise in the store on the night of the fire. In the trunk pointed out as the defendant's trunk witness found a pair of pants and a vest, which he identified as belonging to the stock of clothing which was in the store on the night of the fire. Witness was now wearing a vest similar to one of the vests found in the baggage pointed out as that of the defendant. The vest found in that baggage and the vest worn by witness belonged to the same stock of goods. Witness's partner, Mr. Perkins, was now wearing a pair of pants similar to a pair found among the articles of defendant's baggage. The witness had never sold to the defendant, nor to Lee Lovelace, J. W. Pickett or Jesse Kaiser, any saddle-pockets, any clothing or any pocket-knives of the stock of goods belonging to the firm of Eplin & Co. Eplin & Co. had about half a dozen pairs of each kind of saddle-bags. The saddle-bags were bought in St. Louis of the house of Pickens & Co. Two or three pairs of each kind had been sold in the neighborhood since they were placed in stock in the fall of 1884. The clothing was bought in Galveston from the house of Halff, Weis & Co. Witness was managing partner of his firm. His partner stayed in the store at times, and Mr. Bud Steadman was clerk. No marks were found on the clothing, and witness could only identify them by their similarity in texture, color and pattern to the clothing he kept in stock.

J. T. Perkins testified, for the State, that he was the junior member of the firm of J. M. Eplin & Co., whose store-house in Yarrelton was burned on the night of April 5, 1885. Witness had seen some of the articles kept in stock since the fire. He first saw a pair

of pants and a vest which he knew to have been in his firm's stock, on the person of Dave Dansby at the "reunion" at Cameron on the 27th day of June, 1885. Witness identified the saddle-bags and articles of clothing in evidence as articles which belonged to his stock of goods at the time of the fire. He recognized the private cost and sale mark of J. M. Eplin & Co. on the flaps of the saddle-bags. He identified the articles of clothing only by their similarity to articles kept in stock by Eplin & Co. at the time of the fire. Eplin & Co. sold goods indiscriminately to whoever would buy, but witness had never sold any articles of the kind in evidence either to the defendant, to Lovelace, to Pickett or to Kaiser.

Bud Steadman testified, for the State, that for more than a year he had been in the employ of Eplin & Co. as clerk. Witness examined the clothing in evidence, and stated that he could not identify those particular articles, but Eplin & Co. had clothing in stock, at the time of the fire, exactly like those in evidence. Witness identified the firm's private cost and sale mark on the flaps of the saddle-bags. Witness never sold any of the goods in evidence to either the defendant, Lovelace, Pickett or Kaiser. On the 27th day of June, 1885, the witness attended the reunion in Cameron. While there Ben Ellis came to him and asked him if he would be able to recognize any of the goods that were in Eplin's store on the night of the fire. Witness replied that he could, and he and Ellis walked down one of the streets in Cameron, and witness saw a young man named Dave Dansby standing on the sidewalk. Young Dansby was then wearing a pair of pants and a vest which the witness recognized as articles from Eplin & Co.'s stock.

S. J. Stapleton testified, for the State, that he lived in Yarrelton, Texas, about one hundred yards from where J. M. Eplin & Co.'s store stood when it was burned in April, 1885. The light of the burning building awakened the witness, and witness, while getting up, saw several persons pass his house rapidly on horseback, going from the direction of the fire. Witness could recognize none of the parties. Witness reached the burning house about the time that Eplin, Elzey and Battenfield arrived. On the next morning, the witness found at the scene of the fire a brace and bits and an auger which he recognized as tools which had been taken from his shop during the night. Witness found that his shop had been broken open. The defendant was perfectly familiar with the witness's shop, and knew where his tools were kept. Witness was at the house of the defendant's father in August, 1884, and there saw and had a conversation with the defendant, who had then but recently returned

from a trip somewhere. Defendant asked witness how things in general were getting along, and particularly how "old Joe" (Mr. Eplin) was progressing, and if he was succeeding as well as Mr. Yarrel had succeeded. Witness replied that Eplin was not selling as many goods as Yarrel had sold. The defendant replied that he was sorry for him on account of the partner (Perkins) he had. Witness asked him why. Defendant replied that he had better let him, defendant, alone, or he might go into ashes. He said that Perkins had been interfering with a case he had in court. That case involved a charge of horse theft of which defendant was acquitted before the fire.

Lee Cox testified, for the State, that he was constable of Iredell precinct in Bosque county, Texas. On or about the last day of June, 1885, the witness and Dave Ford, deputy sheriff of McLennan county, Texas, arrested the defendant about two and a half miles east of Iredell. Defendant was then going by the name of Russ Drew. Witness went to the depot with defendant when the latter was taken to Waco. Defendant wrote a note to Parker to go to his, defendant's, house, get his things, and take them to his, Parker's, house. Afterwards John Anderson and Eplin arrived, and a search warrant was procured, and Parker's house searched. Parker pointed out defendant's things, including the articles in evidence on this trial.

Harmon Dansby testified, for the State, that he lived in Milam county, Texas, in 1884, but in Bell county during the year 1885. On Wednesday after the Sunday on which Eplin's store was burned, the witness heard of it. On the Tuesday after the said Sunday, J. W. Pickett came to a point near witness's house, where witness and his little son were at work. He asked witness if anybody was about the house. Witness replied in the negative, and asked where the "other boys were." He replied that they "were about," rode down the fence a short distance and blew a whistle on his fingers. Presently defendant, Lovelace and a half-breed of some kind — half-Indian witness thought — whom witness did not know, came up on horseback and stopped near witness's bois d' arc hedge, in a small hollow. They appeared anxious to keep concealed. Each of the parties named had well filled new saddle-bags, and each was well dressed in new clothes. Pickett's pants were torn on the side of the right leg. Witness asked them where they were during the recent heavy rain. They said that they spent the night of the rain in Lyd Smith's field. Witness asked them how they managed to keep dry, and they replied that they had an abundant supply of dry clothes. Pickett then took a pair of pants and a vest out of his saddle-bags

and gave them to the witness. He gave a vest to a man named Wells, then staying at the witness's house. He also gave a pocket-knife to the witness's little son Willie. As Pickett presented these articles, he remarked: "Boys, we struck a rich thing the other night. You ought to have been with us." The defendant and the other parties were present when Pickett made the statement and distributed the articles mentioned. Witness's wife cooked a meal for the parties, and the witness's little son took the victuals to them in the hollow. The parties remained near witness's house from 8 o'clock until 3 o'clock P. M., and during that time the man Wells cut the hair and shaved the faces of the defendant and Pickett.

The parties, when they left, said that they were going west. Witness gave the pants and vest given him by Pickett to his nephew, Dave Dansby. Dave wore them to the reunion in Cameron, and was still wearing them. About two weeks after the burning of Eplin's store, Ben Ellis came to witness's house in search of a horse, and witness told him about the defendant, Pickett, Lovelace and the half-breed being at his place, and what occurred at that time. Witness tried to impress upon Ellis the importance of keeping that information secret. The saddle-bags in evidence resembled the saddle-bags the parties had at witness's house. One of the pairs of pants exhibited resembled the pants worn by Pickett on that occasion. The pants in evidence were torn in the same manner and in the same place that the pants worn by Pickett were torn. Witness identified a vest in evidence as the vest worn by Pickett on the occasion described, and another vest as the vest which Pickett gave to Mr. Wells. He identified a second pair of pants as those worn on the Tuesday mentioned, at his house, by the defendant.

The witness took especial notice of everything said and done, worn and exhibited by the four parties on the Tuesday in question, because, some time previous to that Tuesday, Deputy Sheriff John Anderson appealed to witness to aid him in apprehending the defendant, for whose arrest on the charge of cattle theft, he, the said Anderson, had a warrant. Witness asked Deputy Sheriff Jack Lewis, of Cameron, if he, witness, could rely on Anderson. Lewis replied that he could, and witness agreed to help Anderson effect defendant's capture. Witness advised Anderson to watch the defendant's wife, as the only means of discovering the defendant's whereabouts. Witness went to Rodgers to report to Anderson on Tuesday evening after the party left his house. Anderson was not at Rodgers. On the next day witness heard that Eplin's store had been burned on the previous Sunday night.

Cross-examined, the witness said that he told Anderson all about the occurrences at his house while defendant and those with him were there on the Tuesday mentioned. Anderson cautioned witness to say nothing about it, and witness did not mention the affair until after the arrest of the defendant, except to Ben Ellis, Anderson and Lewis, as stated. The witness showed Fletch Bowers the tracks of the horses ridden by the parties, and the hair cut from the heads of defendant and Pickett. Yarrelton was some eighteen or twenty miles from where the witness lived. When witness gave the pants and vest given him by Pickett to Dave Dansby, he told Dave that he bought them in Temple, and told him so because Anderson had directed him to keep secret the transactions with the defendant's party.

Deputy Sheriff John Anderson testified, for the State, that prior to the burning of Eplin's store he had papers for the arrest of the defendant for cattle theft, and appealed to H. Dansby to assist him in effecting defendant's arrest. Dansby agreed to help witness. In a conversation with Dansby a short time after the fire, Dansby told witness that they could discover the whereabouts of defendant only by watching the defendant's wife. Dansby found out where defendant's wife was, informed witness, and witness reported to Lipscomb, who wrote to the sheriff of McLennan county. Witness then had warrants for the arrest of defendant, Lovelace, Pickett and Kaiser on the charge of burning Eplin & Co.'s store. Eplin sued out a warrant to search Dansby's house, and witness with Eplin and others executed it, finding some clothing, including a vest, which Eplin identified.

Cross-examined, the witness said that on the Sunday following the fire he had a conversation with H. Dansby in Cameron, when Dansby told him about defendant and the other parties being at his place on Tuesday, and that Pickett gave him a pair of pants and a vest, and a vest to Wells. He told witness how the parties were dressed, and about the torn place on Pickett's pants, and what the parties said.

The State read in evidence the affidavits, made upon information and belief, by J. M. Eplin, on April 6, 1885, charging defendant, Pickett, Lovelace and Kaiser with this offense, and the warrants of arrest against Lovelace.

Willie Dansby, the son of Harmon Dansby, testifying for the State, corroborated his father in every particular as to what occurred at Dansby's house on the Tuesday after the fire. The State closed. The opinion discloses the objections interposed by the defense to parts of the foregoing testimony.

Sam Ray testified, for the defendant, that he lived in Bell county, Texas. Witness owed a note, payable in Belton on April 1, 1885, and wrote the holder that he would be in Belton on the first Monday in April, to pay it. Will Parker, of Bosque county, was in the witness's debt, and the witness left Temple on the 1st day of April to go to Parker's house in Bosque county to get the money. It was his purpose to go thence to Fort Worth on a visit to a brother. Witness reached Meridian, Bosque county, on the night of April 1, 1885, and on the next day went to Parker's house, where he saw the defendant at work. On the next day witness and Parker went to Fort Worth. Witness's brother was not in Fort Worth, and witness and Parker went back to Parker's house, arriving there on the night of April 5th, the same being Sunday. He did not see defendant on that night, but on the next day the defendant drove the witness and Will Parker to Meridian in a wagon. Parker's wife was on a visit to her mother in Echo, in Bell county, and Parker went with witness as far as Temple to meet her. Thence the witness went to Belton.

On his cross-examination the witness detailed his movements from April 1, 1885, until the morning of April 6, 1885, when defendant, going under the name of Russ Drew, drove him and Parker to Meridian, from Parker's house, in a wagon. He repeated, in substance, his statement on his examination in chief.

Loring Davis testified that he lived in Bosque county in April, 1885, about four and a half miles from Will Parker's house. On or about March 20, 1885, the defendant, calling himself Russ Drew, came to the witness's house and asked where he could rent a house. A man calling himself Johnson, whom the witness afterwards learned was named Pickett, was with him. They were directed to a Mrs. Fox, living in the neighborhood, who had a vacant house. Witness saw the defendant on the third day after that first interview. Witness cut his foot with an axe on March 30th, and remembered that he saw the defendant two or three days before that. Witness was confined to his bed twelve or fifteen days. When able to get about he went fishing, and *en route* passed defendant's house and saw him. That was the day of the heavy storm. Pickett left the neighborhood a day or two after witness got his foot cut, and did not return for eight or ten days. Witness did not see defendant during Pickett's absence. Defendant lived at the house in witness's neighborhood until his arrest.

Mrs. Knipp testified that she was a sister of Loring Davis. Defendant, as Russ Drew, and Pickett, as Johnson, came to the house of Loring Davis about the middle of March, 1885, and were sent

to Mrs. Fox, from whom they rented a house. Loring Davis cut his foot about March 30, 1885, and was in bed about a week. Witness saw defendant two or three days after Loring cut his foot, and told him of the accident. That was on Friday. She saw the defendant in Bosque county again on Saturday.

Mrs. Fox testified, for the defense, that she lived in Bosque county. She rented a house to the defendant and Pickett some time in March, 1885. Defendant borrowed some carpenters' tools from witness, and brought them home while Mrs. Knipp was at her house. Mrs. Knipp told defendant that her brother cut his foot on the preceding Monday.

Mrs. Parker, senior, testified, for the defense, that she was the mother of Willis Parker, and lived with him in Bosque county in 1885. She first saw the defendant on March 19, 1885. He was then hunting a house to rent, and was directed to Mrs. Davis. He returned within a few days and went to work for Willis Parker, on a store-house, and building a fence. He worked for Willis Parker some five or six weeks. On Saturday defendant went to his house, returned on Sunday, and told witness that Davis had cut his foot. Willis's wife left home on the 1st day of April, 1885, to visit her mother in Bell county. She returned on Friday, having been gone about a week. Defendant drove Willis Parker and Sam Ray to Meridian on Monday. Ray reached Will Parker's house on April 2, 1885, and left for Fort Worth on the next day, and was gone three or four days. They got back on Sunday night, and, in answer to witness's question, said that they saw Ray's brother. A man called Johnson called occasionally at Will Parker's house, and on one occasion left a pair of saddle-bags. Anderson, Cox and Eplin came to and searched the house of Will Parker, where they found two pairs of saddle-bags, two pairs of pants and two vests. One pair of those pants was brought there by Johnson, who wanted to hire witness to patch them. One pair of the saddle-bags was left at the house by Johnson. The other pair was brought to the house with defendant's things.

Mrs. Minnie Parker testified, for the defense, that she was Will Parker's wife. On or about April 1, 1885, witness left home in Bosque county to visit her mother in Bell county. Her husband came after her on the following Monday. Witness's mother went home with her. Meridian was reached on Tuesday, and home the next day. The day on which witness got home was April 8th. The defendant was at Will Parker's house on the day that witness left, and was there on the day she returned.

A. J. Lewis testified, for the defense, that he jailed H. Dansby on this charge. Sheriff Lipscomb sent Dansby and Wells to witness with instructions to hold them. Having no warrant against Dansby he was released on the next day. Witness did not understand why he was to hold Dansby. He had a pistol case against Wells.

W. A. Neighbors testified, for the defense, that he had known H. Dansby for eight or ten years, during which time his reputation for truth and veracity had been very bad.

Cross-examined, the witness stated that he heard the reputation of Dansby for truth and veracity very largely discussed during the trials of Lem Maddox, Cy. Jackson and Joe Jones, in which cases Dansby was a witness. His reputation was sought to be impeached in each of those cases. The family connections of Maddox and Jackson were numerous and influential in the neighborhoods. J. B. Gilliland testified substantially as did the witness Neighbors. Eight other witnesses, with little variation, testified to the same effect.

Hiram Dansby testified, for the defense, that he was a brother to Harmon Dansby. Harmon, when he gave the pants and vest to Dave Dansby, said that he bought them in Temple, paying $10 for them.

The motion for new trial raised the questions discussed in the opinion.

*Ford & Ford*, for the appellant.

*J. H. Burts*, Assistant Attorney-General, for the State.

White, Presiding Judge. Appellant and two other parties were jointly indicted for the burning of the store-house of Eplin & Co. The record is quite voluminous, and we find in it nine bills of exception saved by defendant to the admission of testimony over his objection. Of these bills of exception we propose only to notice briefly those which we consider of any importance.

1. The State was permitted to prove, over objection of defendant, that before the offense of arson for which defendant was on trial had been committed, defendant was under charge for another distinct crime,—was a fugitive evading arrest,—and the steps which the officers of the law had taken to secure his arrest for said crime.

"It is not only a fundamental but it is laid down as the *first rule* governing the production of evidence, that the evidence offered must correspond with the allegations and be confined to the point in issue. This rule excludes all evidence of collateral facts or those which are

incapable of affording any reasonable presumption or inference as to the principal fact or matter in dispute, and the reason is that such evidence tends to draw away the minds of the jurors from the point in issue, and to excite, prejudice and mislead them." (*Cesure* v. *The State*, 1 Texas Ct. App., 19, citing 1 Greenlf. Evid., § 5051; *Persons* v. *The State*, 3 Texas Ct. App., 241; *Green* v. *The State*, 12 Texas Ct. App., 51; *Williamson* v. *The State*, 13 Texas Ct. App., 514.)' It was error to admit the evidence.

2. In the absence of defendant at the time the statements were made, it was error to permit the witness Dansby to testify as to what he told Anderson about the clothing found in his house, and it was hearsay to permit Anderson to testify as to what Dansby told him on that occasion. (*Gonzales* v. *The State*, 16 Texas Ct. App., 152; *Washington* v. *The State*, 17 Texas Ct. App., 197; *Anderson* v. *The State*, 14 Texas Ct. App., 49; *Segura* v. *The State*, 16 Texas Ct. App., 221; *Fuller* v. *The State*, 19 Texas Ct. App., 380.)

3. It was error to admit in evidence against this defendant the four *ex parte* affidavits of Eplin, charging appellant, and the other parties jointly indicted with him, with the burning of the storehouse. These affidavits were *ex parte;* they were hearsay; they were not binding in any manner upon defendant, he having had nothing to do with their being made at the time when made. They were *res inter alios acta,* and inadmissible against defendant.

4. Lovelace, one of the parties who originally was jointly charged with defendant in the commission of the crime, had, in an effort made to arrest him for the offense, shot the officer, and the officer had killed him. Over objection of this defendant the State was permitted to introduce in evidence the torn and bloody warrant which the officer was attempting to execute upon Lovelace when the latter shot the former. Such evidence was most clearly inadmissible. It tended to prove nothing against this defendant, and it was strongly calculated to inflame and prejudice the minds of the jury against this defendant as being a confederate of Lovelace in the commission of a crime which resulted in such bloody consequences and so seriously endangered the life of a faithful and zealous officer.

Other errors assigned and complained of have not been discussed, because it is believed that such as are in any manner tenable are not likely to arise on another trial. For the errors pointed out the judgment is reversed and the cause remanded for another trial.

*Reversed and remanded.*